**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **KENNETH D. LEEK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case. No. 21-3100-SAC-ADM** |
| | ) | |
| **KATHRYN A. ANDROSKI, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

In accordance with D. Kan. Rules 7.1(a) and 7.6, Defendants Misti Kroeker, James Skidmore, John P. Stiffin, and Shannon L. Meyer (the "KDOC Defendants"), submit this memorandum, through Assistant Attorney General Matthew L. Shoger, in support of their motion under Fed. R. Civ. P. 12(b)(1) and (b)(6) or Fed. R. Civ. P. 56. The KDOC Defendants respectfully request that this motion be granted and this action be dismissed, or, in the alternative, summary judgment be granted in their favor. The KDOC Defendants attach eighteen new exhibits, outlined in the table below, and state the following in support.

**INDEX OF EXHIBITS**

| **Exhibit** | **Description** |
|---|---|
| A | KASPER Information Sheet |
| B | Description of KASPER from the KDOC website |
| C | Movement Record for Inmate Leek |
| D | KDOC Acronyms and Specialized Terms |
| E | Declaration of Shannon Meyer |
| F | Declaration of James Skidmore |
| G | Declaration of John Stiffin |
| H | Declaration of Joel Hrabe |
| *I* | *Not used* |

| | |
|---|---|
| J | KDOC IMPP 10-101A (regarding programs and services)<br>*effective date: August 12, 2016* |
| K | KDOC IMPP 10-107 (regarding library services)<br>*effective date: November 7, 2002* |
| L | KDOC IMPP 10-142D (regarding electronic tablets)<br>*all versions since: April 10, 2019* |
| M | KDOC IMPP 20-101A (regarding restrictive housing standards)<br>*all versions since: March 10, 2021* |
| N | KDOC IMPP's 20-104 and 20-104A (regarding restrictive housing placements)<br>*all versions since: July 21, 2004* |
| O | KDOC IMPP 20-105A (regarding restrictive housing operations)<br>*all versions since: April 9, 2021* |
| P | LCF General Order 10-105 (regarding long term restrictive housing)<br>*all versions since: March 30, 2021* |
| Q | LCF General Order 21-101 (regarding library operations)<br>*effective date: June 30, 2020* |
| R | LCF General Order 21-102 (regarding library staff)<br>*effective date: May 12, 2017* |
| S | Screenshots of LexisNexis Content Available to Inmates |

## NATURE OF THE CASE

Plaintiff Kenneth D. Leek alleges that from approximately May 20, 2020, to September 20, 2021 – while incarcerated under the Kansas Department of Corrections (KDOC) at Hutchinson Correctional Facility (HCF) and Lansing Correctional Facility (LCF) – KDOC employees violated his right of access to the courts. (Doc. 9 at 18-20.) He alleges they did this by preventing him from working with other prisoners to conduct legal research and writing and by providing inadequate legal resources or assistance while he worked on court documents in two other cases – one in state court, *Leek v. Brown*, 513 P.3d 501 (table opinion), No. 123,711, 2022 WL 2904037 (Kan. Ct. App. 2022), and one in federal court, *Leek v. Scoggin*, No. 20-3051-SAC, 2021 WL 4263502 (D. Kan. Sept. 20, 2021).[1] (Doc. 9 at 12, 16, 18-20.) He also alleges a state

[1] Leek does not specify dates for all events alleged in his complaint, but the earliest specified date in his complaint and attached exhibits is May 20, 2020 (Doc. 9-1 at 9) and the latest relevant date appears to be the final judgment dismissing his underlying claim in *Scoggin* on September

law breach-of-contract claim, allegedly as a third-party beneficiary, against Defendants ICSolutions and Kroeker for failure to provide free access to law library materials on tablet computers used by inmates. (Doc. 9 at 13-15, 20.)

Leek filed this lawsuit on April 13, 2021 (Doc. 1), and he filed his Second Amended Complaint on July 29, 2021 (Doc. 9). Leek seeks declaratory relief, injunctive relief, and nominal, compensatory, and punitive damages, along with costs. (Doc. 9 at 20-22.)

On September 2, 2021, during screening under the Prison Litigation Reform Act (PLRA), 28 U.S.C. § 1915A, this Court dismissed all of Leek's claims. (Doc. 8 at 1-2 ("This case is before the court for the purposes of screening plaintiff's . . . complaint . . . pursuant to 28 U.S.C. § 1915A."); Doc. 11 (dismissal).) On appeal, the Tenth Circuit affirmed the dismissal of most claims, but (1) reversed the dismissal of Leek's access-to-courts claim against the KDOC Defendants in so far as it relates specifically to his attempts to respond to a June 16th, 2021, order to show cause in *Scoggin* and (2) reinstated his state law breach-of-contract claim against ICSolutions and Kroeker for this Court "to reconsider whether to exercise supplemental jurisdiction over that claim at the appropriate procedural juncture." (Doc. 23 at 8-9, 16.). Regarding the remaining access-to-courts claim now before the Court, Leek alleges the KDOC Defendants provided him with inadequate legal resources for him to adequately respond to the Court's June 16th, 2021, order to show cause within thirty days in *Scoggin*, Doc. 47. (Doc. 9 at 15-17, 20.) He alleges that he was not allowed to access any law books and could only obtain access to cases by filling out a request form on which he had to provide the exact citation for each case. (Doc. 9 at 15-17, 20.)

---

20, 2021. The Kansas Court of Appeals appointed legal counsel for his underlying claim in *Brown* before that on July 27, 2021.

No claims presently remain against Defendant Skidmore, so he should be dismissed from this case. This Court should dismiss for lack of subject-matter jurisdiction Leek's access-to-courts claim against the remaining KDOC Defendants due to Eleventh Amendment immunity and lack of constitutional standing. If the Court has jurisdiction, it should dismiss this claim for failure to state a claim not barred by qualified immunity. Alternatively, the Court should grant summary judgment on this claim to the KDOC Defendants due to the record supporting qualified immunity or clearly failing to support Leek's claim. Even if the access-to-courts claim survives summary judgment, the Court should grant partial summary judgment to the KDOC Defendants to limit remedies because Leek would only be entitled to nominal damages. Finally, the Court should dismiss the breach-of-contract claim on the merits for clear lack of contractual standing or, alternatively, decline to exercise supplemental jurisdiction over it.

## STATEMENT OF MATERIAL FACTS AS TO WHICH NO GENUINE ISSUE EXISTS

### *Restrictive Housing*

1. Inmates at prison facilities operated by the Kansas Department of Corrections (KDOC) can be placed in Restrictive Housing (RH) for reasons including disciplinary segregation (which is limited to 15 days), protective custody, active investigation, other security risk, and consistent bad behavior. Ex. N (policy); Ex. F at ¶¶ 3, 9 (practice); Ex. E at ¶ 11 (same).
2. In Restrictive Housing, inmates are kept separate from inmates in general population whenever possible to prevent violent incidents and to prevent dangerous communications, which could be used to coordinate various security threats. Ex. M at 6 (policy); Ex. N at 6, 12 (same); Ex. O at 6 (same); Ex. F at ¶¶ 3, 10 (practice); Ex. E at ¶ 13 (same).

3. Any time RH residents leave their RH pod, they could potentially leave a note or run into other people with whom they could communicate or cause an incident. Taking them out of the pod would defeat the purpose of the RH units. Ex. E at ¶ 13 (at least during the times relevant to this case).
4. Medical services and meals are provided in each RH pod to keep inmates in RH from having to leave their pod for those services. They would only leave the pod for medical services in the case of a medical emergency. Ex. E at ¶ 14 (at least during the times relevant to this case).
5. Although communications inside the prison are limited for RH residents, communications outside the prison are less limited. RH residents can talk with family on the phone almost daily and communicate by writing via mail or electronic messages via the software service J-Pay, which is available to them on tablets that they can check out. Ex. E at ¶ 15 (at least during the times relevant to this case).
6. Whether in general population or RH, an inmate's list of allowed phone contacts is screened. All phone calls (other than legal calls) for any inmate are recorded. RH residents' phone calls (other than legal calls) are more closely monitored than those of residents in general population. Ex. E at ¶ 16 (at least during the times relevant to this case).
7. Because of the heightened risks associated with RH residents, they are handcuffed when transported. They use caged showers, have caged yard time, and must be in chair restraints when in any classes. Ex. F at ¶ 18.
8. Special Management is another name for RH. Ex. F at ¶ 17.

***Long Term Restrictive Housing***

9. On March 30, 2021, Lansing Correctional Facility (LCF) opened a new unit called the Long Term Restrictive Housing (LTRH) unit. Ex. F at ¶ 6; Ex. E at ¶ 10; Ex. P at 1 (effective date).

10. The LTRH unit housed inmates from prisons all over the state who were the most violent, the most influential with regard to security threats such as gang activities, smuggling contraband, or compromising staff, or had the worst behavior issues such as repeated offenses related to contraband, undue familiarity with staff, or lewd acts. Ex. P at 1 (policy); Ex. F at ¶¶ 4, 7 (practice); Ex. E at ¶ 10 (same).

11. The LTRH unit was intended to house these inmates for at least a year before hopefully starting the rehabilitative process of reintroducing the inmates into General Population. Ex. E at ¶ 10; Ex. F at ¶ 8.

12. Other RH at LCF is relatively short-term in comparison. Ex. E at ¶ 11; Ex. F at ¶ 9.

13. The purpose of the LTRH unit is largely to cut down further on communications so the LTRH residents cannot coordinate security threats (such as calling in hits on other inmates or staff) and to cut down further on contraband. In other words, compared to other RH units at LCF, the LTRH unit has an increased emphasis on preventing dangerous communications that could be used to coordinate security threats and on preventing contraband. Ex. F at ¶ 11.

14. The LTRH unit is highly secure. All staff allowed in the LTRH unit must be screened by the Enforcement Apprehension and Investigation division, with approval granted by the deputy warden of operations or by the deputy warden's designee. Ex. F at ¶ 12.

15. All LTRH residents are placed on a "readable mail" list, which means security staff can read the resident's mail (other than legal mail) to make sure orders regarding violence or

contraband cannot pass between security threat group leaders and general population residents. Ex. F at ¶ 13.

16. Access is limited to the change/move sheet for the LTRH unit so that general population residents that deliver meals do not know where certain people are assigned. This prevents the passing of information and contraband. Ex. F at ¶ 14.
17. Communication with visitors is limited to video meetings for LTRH residents. Ex. F at ¶ 15.
18. Communication is also limited between the residents within the LTRH unit. Ex. F at ¶ 16.
19. Inmates in LTRH as well as most inmates in RH are in RH because they are a very dangerous group of individuals with a high potential for bad behaviors to continue. Being in RH, they sometimes feel they do not have a lot to lose, which can exacerbate behaviors further. Ex. E at ¶ 12.

**_The_ Scoggin _Case_**

20. Inmate Kenneth D. Leek is a 5’9”, 212-pound inmate who has been incarcerated at various KDOC prison facilities since 1996. Ex. A at 1-3.
21. As of January 16, 2020, Leek was housed in general population at Hutchinson Correctional Facility (HCF) in the rehabilitation program. Ex. C at ¶ 3.
22. On February 10, 2020, Leek filed his initial Complaint in the *Leek v. Scoggin* case. *Leek v. Scoggin*, No. 20-3051-SAC, 2021 WL 4263502 (D. Kan. Sept. 20, 2021) (Doc. 1); *Gee v. Pacheco*, 627 F.3d 1178, 1186, 1191 (10th Cir. 2010) (courts can take judicial notice of records in related court proceedings).
23. On July 3, 2020, Leek filed his First Amended Complaint in the *Scoggin* case. *Leek v. Scoggin*, No. 20-3051-SAC (Doc. 14).

24. On November 4, 2020, Leek was moved to Restrictive Housing at HCF on pre-hearing detention status. Ex. C at ¶ 4; *see also* Ex. N at 2, 8, 14.

25. On November 16, 2020, Leek's status was changed to disciplinary segregation due to disciplinary conviction of possessing an unauthorized cellphone. Ex. C at ¶ 5; Ex. A at 3; Pl.'s 2d Am. Compl. at ¶ 43.

26. On November 19, 2020, Leek's status was changed to other security risk. Ex. C at ¶ 6.

27. On April 28, 2021, Leek was transferred to Lansing Correctional Facility (LCF). After this transfer to LCF, his status remained as other security risk. While at LCF during this period, he was housed in Long Term Restrictive Housing. Ex. A at 2; Ex. C at ¶ 7.

28. On June 16, 2021, this Court ordered Leek to show cause why his First Amended Complaint should not be dismissed in the *Scoggin* case. *Leek v. Scoggin*, No. 20-3051-SAC (Doc. 47).

29. On July 12, 2021, Leek filed a response to the Court's order to show cause in the *Scoggin* case. *Leek v. Scoggin*, No. 20-3051-SAC (Doc. 48).

30. In that response, Leek cited ten different cases, including their exact citations. He provided quotations from eight of those cases. *Id.*

31. On September 20, 2021, the Court dismissed the *Scoggin* case. *Leek v. Scoggin*, No. 20-3051-SAC (Docs. 51-52).

32. On April 12, 2022, Leek was transferred to El Dorado Correctional Facility (EDCF). After this transfer to EDCF, his status remained as other security risk. While at EDCF during this period, he was housed in Restrictive Housing. Ex. A at 2; Ex. C at ¶ 8.

33. On June 21, 2022, Leek was temporarily transferred back to LCF. After this transfer to LCF, his status remained as other security risk. While at LCF during this period, he was housed in Restrictive Housing. Ex. A at 2; Ex. C at ¶ 9.

34. On June 28, 2022, Leek was transferred back to EDCF. After this transfer to EDCF, his status remained as other security risk. Since this transfer to EDCF, Leek has been housed in Restrictive Housing. Ex. A at 2; Ex. C at ¶ 10.

***Library Services for Inmates***

35. KDOC offers to inmates "a variety of offender programs and services directed at reducing the offender's overall level of risk," including "[l]ibrary services" to inmates "as funding permits," although the extent of availability of the programs and services may vary at each facility. Ex. J at 1 & § I(A)(9) (policy); Ex. F at ¶ 3 (practice).

36. KDOC law libraries provide several kinds of legal materials to inmates, including to RH residents. Ex. K, § II(A) (policy); Ex. M at 3, 8 (same); Ex. F at ¶ 3 (practice); Ex. G at ¶ 10 (same); Ex. H at ¶ 2 (same).

37. Many of these legal materials are provided by means of LexisNexis. Ex. Q, § IV(B) (policy); Ex. G at ¶ 10 (practice); Ex. H at ¶ 3 (same); Ex. S (screenshots of available content on LexisNexis for KDOC inmates).

38. The primary means of providing LexisNexis to inmates is on desktop computers in the library at an annual cost to KDOC of $57,350 per console. Ex. G at ¶¶ 7, 10, 14; Ex. H at ¶ 3.

39. The cost of providing access to LexisNexis on tablets is billed on a mandatory per-resident basis. With the Department having an average 10,400 residents at the time the LexisNexis contract was bid, the cost was prohibitive at more than approximately $114,000 annually. Ex. H. at ¶ 3.

40. Inmates in restrictive housing have certain privileges restricted, but are provided access to legal materials. Ex. M at 3, 8 (policy); Ex. F at ¶¶ 3, 6-33 (practice); Ex. E at ¶¶ 10-35 (same); Ex. G at ¶¶ 21-43 (same).

41. Prison facilities have their own facility-level general orders for "[t]he management and control of legal materials" and "[a]ccess to supplies, services, and assistance in legal matters." Ex. K, §§ II(B), IV(A) (policy); Ex. Q (same); Ex. R (same); Ex. G at ¶¶ 10-11 (practice); Ex. E at ¶ 7-9 (same); Ex. F at ¶ 5 (same).

42. Physical library access is not allowed for inmates in RH to prevent violent incidents, to prevent communication with security threat groups, and because it would be impossible to find enough staff to escort numerous RH inmates back and forth to the library. Ex. E at ¶ 17; Ex. F at ¶ 19; Ex. G at ¶ 21.

43. At LCF, on the way to the library, inmates would likely pass by twenty to 100 other people, as General Population has a lot of foot traffic. This contact could lead to the kind of incidents and communications that the RH units were meant to prevent. Ex. E at ¶ 18.

44. At LCF, legal materials are requested by RH inmates by means of a Form 9. Ex. Q, §§ I(B), IV(D) (policy); Ex. G at ¶¶ 4, 11 (practice); Ex. E at ¶ 29 (same).

45. At LCF, hardcover books are not allowed in RH units because inmates can easily hide messages or contraband in the bindings of the books, use the books as bludgeoning weapons, or even make makeshift body armor out of them. Ex. E at ¶ 19; Ex. F at ¶ 20; Ex. G at ¶ 22.

46. At LCF, Paperback books can be delivered to RH residents, although limited in number per resident. But most law books in the library are hardcover. Ex. E at ¶ 20; Ex. F at ¶ 21; Ex. G at ¶¶ 23, 26.

47. Further, at LCF, legal reference materials must remain in the library and may not be checked out. Ex. Q, §§ VI(B) (policy); Ex. G at ¶¶ 11, 24 (practice).

48. The law books that are paperback are considered reference materials. As a result, no law books can be directly checked out by RH inmates. Ex. G at ¶ 26.

49. At LCF, RH residents can receive photocopies of the table of contents of a book or a particular section of a book. Ex. E at ¶ 30; Ex. G at ¶ 27.

50. At LCF, RH residents can receive a list of law books available upon request. Ex. G at ¶ 28.

51. At LCF, RH residents can receive tables of contents from the United States Code, which could be a table of contents of the available Titles or of the contents within a Title. Ex. Q, §§ VI(B)(1)-(2) (policy); Ex. G at ¶¶ 11, 29 (practice).

52. At LCF, copies of cases can be provided by library staff if enough identifying information is provided to make clear which case the inmate wants, such as a citation or a case title. Ex. Q, §§ VI(B)(1)-(2) (policy); Ex. G at ¶¶ 11, 30 (practice); Ex. E at ¶ 32.

53. At LCF, for budgetary reasons, RH residents can check out three items at a time without charge for two weeks each. Ex. G at ¶ 31.

54. At LCF, RH residents can ask their unit teams for an exception to the checkout limit based on the demands and deadlines of the resident's active court cases. If approved by the RH resident's unit team, the library allows the RH resident to check out more than three items. Ex. G at ¶ 32.

55. At LCF, if an inmate wants additional copies, they can receive them using copy tickets or account withdrawal requests. This process helps manage the costs associated with these copies. Ex. Q, §§ VI(C) (policy); Ex. G at ¶¶ 11, 33, 17-19 (practice).

56. Copy tickets are yellow, are about the size of a business card, and have twenty punches. One punch is used per page. They can be purchased from the canteen. Ex. G at ¶ 17.

57. AWR's are requests for withdrawals from the inmate's account and are separate from canteen purchases. AWR's can only be made for charges exceeding $15 worth of material—which would be more than 150 pages at ten cents per page—or under indigent status. Ex. G at ¶ 18.

58. Indigent forms allow inmates to pay a copying charge using an AWR for charges up to $15 if they are indigent. This avoids the need to use copy tickets. Many inmates qualify to use indigent forms for materials related to their cases. Ex. G at ¶¶ 19-20.

59. Leek checked out twelve cases from the LCF library between May 2021, and September 2021, including three on July 1, 2021. Ex. G at ¶¶ 5-6, App. A.

60. The three cases Leek checked out from the LCF library on July 1, 2021 were not cited in this Court's June 16, 2021, order to show cause in the *Scoggin* case. *Compare* Ex. G App. A *with Leek v. Scoggin*, No. 20-3051-SAC (Doc. 47).

61. At LCF, library employees go to the RH units every day, except weekends and holidays, to deliver and pick up checked out resources. Generally, they deliver the resources to the Officer in Charge (OIC) of the unit and also pickup resources from the OIC. Otherwise, they will leave the delivered resources in the unit team's mailbox. Ex. G at ¶ 34.

62. At LCF, RH residents can also receive copies of KDOC Internal Management Policies and Procedures (IMPP's) and facility General Orders (GO's) upon request or lists of available IMPP's and GO's. Ex. E at ¶ 31; Ex. G at ¶¶ 35-36.

63. At LCF, the library sends out hundreds of copies of case law and policies every month. Ex. G at ¶ 37.

64. At LCF, the library also frequently provides RH residents with free tax forms, legal forms from the Kansas Judicial Council at cost, and instructions on how to receive a free K.S.A. 60-1507 form from the clerk of the court. Ex. G at ¶ 38-40.

65. Inmates can make Kansas Open Records Act requests, which are handled by LCF's Public Information Officer. Ex. F at ¶ 32.

66. The library e-files to the district court any court filings received from inmates. Ex. G at ¶ 8.

67. In the last six years, the library has also provided thousands of "legal packs" to inmates upon request, which include paper, envelopes, and manila envelopes. Ex. G at ¶¶ 1, 9.

68. Library staff is not licensed to practice law and therefore requests for assistance in locating cases or other legal resources are referred to Charles Cavenee at Legal Services for Prisoners. Requests for assistance in interpreting IMPP's are also referred to Legal Services for Prisoners. Ex. G at ¶ 42; Ex. E at ¶ 33; Ex. F at ¶ 31.

69. RH residents also sometimes receive assistance in locating legal resources through phone calls with outside individuals. Ex. E at ¶ 34.

70. Paperwork limits apply to inmates in RH to help prevent contraband (including "saturated paper"), fire hazards, arson, clutter, and visibility obstruction. Ex. F at ¶ 22-27; Ex. E at ¶ 21-25.

71. Exceptions to the paperwork limits can be granted by facility attorneys based on the demands and deadlines of an inmate's active court cases. Ex. E at ¶ 26; Ex. F at ¶ 28.

72. Partner research is generally not allowed for RH residents to prevent dangerous communications. Ex. E at ¶ 27; Ex. F at ¶ 29; *see also* Ex. G at ¶ 41.

73. When Leek requested for another resident to help him with legal work while in LTRH at LCF, it was denied to prevent communication with other residents as an attempt to introduce contraband or pass on security threat group information. Ex. F at ¶ 30.

***LexisNexis on Tablets***

74. KDOC makes electronic tablets available to inmates as a privilege. All applications and content available through the tablets must be approved by KDOC prior to being made available to the resident population. Ex. L at 1, 5 (policy); Ex. F at ¶ 3 (practice).

75. Until recently, inmates could not access Lexis Nexis on the tablets. Ex. E at ¶ 28; Ex. H at ¶ 3.

76. In 2022, KDOC began making changes to the management and housing of RH residents. As part of those efforts, KDOC obtained 18 tablets for the exclusive purpose of granting inmates access to LexisNexis. Ex. H at ¶ 4.

77. With access to LexisNexis now available to RH residents on tablets, RH residents have the same time to conduct legal research and the ability to request copies of case law and other materials as general population residents. Ex. H at ¶ 5; Ex. F at ¶ 33; Ex. G at ¶ 43.

**QUESTIONS PRESENTED**

I. Should Deputy Warden James Skidmore be dismissed from this case when all claims against him have already been dismissed?

II. As a matter of law, does the Eleventh Amendment bar Leek's § 1983 claims against Warden Shannon L. Meyer in her official capacity for monetary damages and for declaratory relief?

III. Does Leek lack constitutional standing to bring his access-to-courts claim for failure to allege an actual injury when his underlying case was not materially impacted?

IV. Are the KDOC Defendants entitled to qualified immunity because their actions – either as alleged or as revealed in the evidentiary record – did not violate clearly established law of which reasonable state officials would have known?

V. Does the record in this case conclusively show that Leek had access to more than just an exact-cite system for retrieving legal resources?

VI. Is Leek entitled to compensatory damages under the Prison Litigation Reform Act when he cannot show physical injury or that his underlying claim would have had a more favorable outcome?

VII. Is Leek entitled to punitive damages when he cannot show any conduct was motivated by evil intent or was undertaken with reckless or callous indifference to his constitutional rights?

VIII. Are Leek's requests for injunctions moot when KDOC has taken corrective measures, Leek has moved to a different facility, and some relevant claims have already been dismissed?

IX. Should the Court dismiss the state law breach-of-contract claim for lack of contractual standing or, alternatively, decline to exercise supplemental jurisdiction over it given the absence of a sufficient federal claim?

## ARGUMENTS AND AUTHORITIES

### *Standard on Motion to Dismiss for Lack of Subject-Matter Jurisdiction*

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss claims for lack of subject-matter jurisdiction. "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Kline v. Biles*, 861 F.3d 1177, 1180 (10th Cir. 2017) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Leek, as the party invoking the Court's jurisdiction, bears the burden of showing its existence. *Id*. "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 906 F.3d 926, 931 (10th Cir. 2018). A federal court must generally "satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999).

A motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) can take the form of either a facial attack, looking only to the factual allegations of the complaint, or a factual attack, presenting evidence to challenge the court's jurisdiction. *Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010). For a facial attack, the same standards apply to the motion as are applicable to a Rule 12(b)(6) motion to dismiss for failure to state a cause of action. *Id.*; *see also Garling v. EPA*, 849 F.3d 1289, 1293 & n.3 (10th Cir. 2017) ("the trial court must apply a standard patterned on Rule 12(b)(6)"). To the extent a factual attack is made, the Court is not required to assume the truth of the complaint's factual allegations for purposes of resolving the jurisdictional issue, but "may consider materials outside the complaint to resolve disputed jurisdictional facts." *Williams v. United States*, 780 F. App'x 657, 660 (10th Cir. 2019); *see also Baker v. USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir.

2020) (saying that resolving disputed jurisdictional facts only converts the motion to a summary judgment motion if "resolution of the jurisdictional question is intertwined with the merits").

***Standard on Motion to Dismiss for Failure to State a Claim***

On a Rule 12(b)(6) motion to dismiss – or a facial attack under 12(b)(1), as mentioned above – a court must accept as true all well-pleaded factual allegations in the complaint, *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009), but a complaint must also contain enough facts to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Brownback v. King*, 141 S. Ct. 740, 749 (2021) ("a plaintiff must plausibly allege all jurisdictional elements"). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Garling*, 849 F.3d at 1293 & n.3 (applying *Twombly* and *Iqbal* to a facial attack on subject-matter jurisdiction under Rule 12(b)(1)). The court need not accept as true those allegations that state only legal conclusions. *Ashcroft*, 556 U.S. at 678. Under this standard, a plaintiff's claim must cross the line from "conceivable to plausible," and "the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis omitted).

Although the sufficiency of a complaint generally rests on its contents alone, the court may also consider: (1) documents that the complaint incorporates by reference, (2) documents that the complaint references if they are central to the plaintiff's claims, and (3) documents of which a court may take judicial notice, which includes court records in any related court proceedings. *Gee v. Pacheco*, 627 F.3d 1178, 1186, 1191 (10th Cir. 2010). At the motion to

dismiss stage, documents of which the court takes judicial notice "may only be considered to show their contents, not to prove the truth of matters asserted therein." *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).

Although courts have traditionally construed *pro se* pleadings in a liberal fashion, this "does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based." *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996). Similarly, courts do not assume the role of an advocate for the *pro se* litigant by constructing arguments or searching the record for potentially viable theories. *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). A *pro se* litigant is expected to construct his or her own arguments or theories and adhere to the same rules of procedure that govern any other litigant in this circuit. *Id.* at 840-41.

***Summary Judgment Standard***

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018). The court views the evidence and draws all reasonable inferences in a light most favorable to the nonmoving party. *McCoy*, 887 F.3d at 1044. "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and "[a]n issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When there is no genuine dispute of material fact on an essential element of the nonmovant's claim, then summary judgment is appropriate. *See Sports Unlimited, Inc. v. Lankford Enters.*, 275 F.3d 996, 999 (10th Cir. 2002).

The nonmoving party cannot create a genuine issue of fact by making allegations that are clearly unsupported by the record as a whole. *Scott v. Harris*, 550 U.S. 372, 378-81 (2007). Facts must be identified by reference to affidavits, deposition transcripts, or incorporated exhibits. *Adler*, 144 F.3d at 671. Relying on mere pleadings or conclusory allegations without supporting facts in the record is not enough. *May v. Segovia*, 929 F.3d 1223, 1234 (10th Cir. 2019).

> [T]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a genuine issue or dispute of material fact. To create a genuine issue, the nonmovant must present facts upon which a reasonable jury could find in favor of the nonmovant.

*Sinclair Wyo. Refin. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 765 (10th Cir. 2021) (citation omitted). What is more, "while courts must construe pro se pleadings liberally, pro se plaintiffs may not rely on conclusory allegations to overcome their burden." *Hastings v. Campbell*, 47 F. App'x 559, 560 (10th Cir. 2002) (citing *Hall*, 935 F.2d at 1110); *see also McCoy*, 887 F.3d at 1044 ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings.").

***Qualified Immunity Standard***

Qualified immunity protects from civil liability government officials whose actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known.[2] *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). Qualified immunity is an affirmative defense that can be raised in a motion to dismiss or in a motion for summary judgment. *Id.* (citing *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)). When a § 1983

[2] Federal statutory rights enforceable under § 1983 are limited in number. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 124-25 (2005) ("a few § 1983 claims are based on statutory rights"). They are not relevant to this case (and are generally not relevant to inmate cases), so the rest of this memorandum refers only to "constitutional rights" as shorthand for the full phrase "statutory or constitutional rights."

defendant raises the qualified immunity defense, it creates a presumption that the defendant is immune from suit. *Janny v. Gamez*, 8 F.4th 883, 913 (10th Cir. 2021). To overcome this presumption, the burden shifts to the plaintiff to show (1) the defendant's alleged conduct violated a federal constitutional right, and (2) that right was clearly established at the time of the alleged violation. *Id.*; *see also Grissom v. Roberts*, 902 F.3d 1162, 1167-68 (10th Cir. 2018) ("only if the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant . . . " (comma omitted)). At the motion to dismiss stage, courts look to the defendant's conduct as alleged in the complaint, while at the summary judgment stage, courts look at the defendant's conduct according to the evidence in the light most favorable to the plaintiff. *Thomas*, 765 F.3d at 1194 (citing *Behrens*, 516 U.S. at 309). "The court has discretion to decide which of the two prongs of the qualified-immunity analysis to address first." *Grissom*, 902 F.3d at 1167 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Simply put, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). In order to overcome the KDOC Defendants' qualified immunity, Leek must show not only that the KDOC Defendants violated his federally secured rights, but also that objectively reasonable officials could not have thought the conduct constitutionally permissible. *Park v. Gaitan*, 680 F. App'x 724, 738 (10th Cir. 2017) (citing *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007)); *see also Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (saying the clearly established right must have been "sufficiently clear that every reasonable official would have understood that what he is doing violates that right"); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (saying clearly established case law must answer the "constitutional question beyond debate"). If a plaintiff fails to satisfy

either prong of the qualified immunity test, a court must grant the defendant qualified immunity. *Grissom*, 902 F.3d at 1167.

Federal precedent offers two avenues for determining whether challenged conduct violates clearly established constitutional rights: "the plaintiff must show there is a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Colbruno v. Kessler*, 928 F.3d 1155, 1161 (10th Cir. 2019). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, but in the light of pre-existing law the unlawfulness must be apparent." *White v. Pauly*, 580 U.S. 73, 137 S. Ct. 548, 552 (2017) (citation omitted). The Supreme Court recently re-emphasized that "the clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). "This Court has repeatedly told courts not to define clearly established law at a high level of generality." *Id.*

## I. All claims against Deputy Warden James Skidmore have already been dismissed, so he should be dismissed from this case.

Leek's only claim against Deputy Warden James Skidmore is for "instituting a policy where prisoners in the LTRH unit are not allowed to mutually assist one another in legal matters," allegedly in violation of Leek's right of access to the courts. (Doc. 9 at 20.) But the Tenth Circuit in its Order and Judgment agreed with this Court that with regard to this claim Leek failed to allege a nonfrivolous claim. (Doc. 23 at 9.) Therefore, all claims against Deputy Warden James Skidmore have already been dismissed, so he should be dismissed from this case.

## II. Leek's access-to-courts claim should be dismissed for lack of subject-matter jurisdiction due to Eleventh Amendment immunity and for lack of constitutional standing.

### A. The Eleventh Amendment bars Leek's § 1983 claims against Warden Meyer in her official capacity for monetary damages and for declaratory relief.

Of the remaining defendants in this action, Leek sues only Warden Shannon L. Meyer in her official capacity. (Doc. 9 at 8.) Even if § 1983 claims could be brought against her in her official capacity, Eleventh Amendment immunity would bar the suit. "The Eleventh Amendment bars suits in federal court against a nonconsenting state brought by the state's own citizens." *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1212 (10th Cir. 2019) (citing *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974)). "This immunity extends to arms of the state and to state officials who are sued for damages in their official capacity." *Id.* As such, employees of KDOC share the state's immunity from suits against them in their official capacities for monetary damages or declaratory relief. *See White v. Colorado*, 82 F.3d 364, 366 (10th Cir. 1996). Because of the presumption that statutes do not abrogate this immunity, state agencies do not even count as "persons" amenable to suit under § 1983, and neither do state officials sued in their official capacities for monetary damages or declaratory relief. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65-67, 71 & n.10 (1989).

A narrow exception to sovereign immunity allows a plaintiff to seek prospective injunctive relief against a state official for ongoing violations of federal law. *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012) (citing *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002)). But the Eleventh Amendment bars claims for "retrospective declaratory relief" against state officials. *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1232 (10th Cir. 2004). "Once effectively asserted, Eleventh Amendment immunity constitutes a bar to the exercise of federal subject-matter jurisdiction." *Williams*, 928 F.3d at 1212.

Here, Leek requests prospective injunctive relief against Meyer, and this particular remedy is exempt from Eleventh Amendment immunity.[3] (Doc. 9 at 21.) But Leek also requests monetary damages in the form of nominal, compensatory, and punitive damages (Doc. 9 at 21-22), which are barred by the Eleventh Amendment as asserted against Warden Meyer in her official capacity. Leek further requests a declaratory judgment stating that Meyer violated his constitutional rights. (Doc. 9 at 20.) To the extent such a declaratory judgment stands as an independent remedy apart from Leek's requested injunctive relief, it is barred by the Eleventh Amendment. Therefore, Leek's claims against Warden Meyer in her official capacity for monetary damages and for declaratory relief should be dismissed for lack of subject-matter jurisdiction due to Eleventh Amendment immunity.

**B. Leek lacks constitutional standing for his access-to-courts claim for failure to allege an actual injury impairing his access to the courts because his underlying case was not materially impacted.**

Leek's access-to-courts claim should be dismissed for lack of subject-matter jurisdiction because Leek fails to plausibly allege an actual injury impairing his right of access to the courts. An actual injury must be shown to establish the standing necessary to invoke federal jurisdiction under Article III's case-or-controversy requirement in the U.S. Constitution. *Lewis v. Casey*, 518 U.S. 343, 349 (1996); *Denver Bible Church v. Polis*, No. 20-1391, 2022 WL 200661, at *10 (10th Cir. Jan. 24, 2022) (citing various Supreme Court and Tenth Circuit cases); *see also* U.S. Const. art. III, § 2, cl. 1. Although inmates have a constitutional right of access to the courts, inmates do not have "an abstract, freestanding right to a law library or legal assistance." *Lewis v.*

---

[3] *See Pruitt*, 669 F.3d at 1167-68 (whether the exception applies is a "straightforward inquiry into [what] the complaint alleges . . . and seeks" without addressing whether the cause of action is "valid"). Therefore, mootness, although jurisdictional, likely does not affect whether this exception applies. Mootness is addressed in section V.C of this memorandum.

*Casey*, 518 U.S. at 351. Rather, to establish a violation of an inmate's right of access to the courts, the inmate "must . . . demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id.*

In the Tenth Circuit's Order on April 18th (hereinafter the "Remand Order"), the Tenth Circuit only addressed two elements of a claim for violation of a plaintiff's right of access to the courts: a plaintiff must plausibly allege (1) a deficiency in the legal resources available, and (2) that the underlying claim was not frivolous. (*See* Doc. 23 at 8-15.) But binding precedent establishes a third element that this Court should take into account: that the deficiency materially impacted the underlying claim, which is necessary for constitutional standing and therefore for subject-matter jurisdiction.

"Subject-matter jurisdiction can never be waived or forfeited," so it can be raised at any time. *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012). What is more, the law of the case doctrine does not apply here because the KDOC Defendants were not party to the case when the Remand Order was issued during screening. *Kansas ex rel. Beck v. Occidental Life Ins. Co.*, 95 F.2d 935, 936 (10th Cir. 1938) (saying the "law of the case . . . . applies to parties and those in privity with them"). The KDOC Defendants filed their waivers of service on June 20, 2022, after the Remand Order on April 18, 2022, so they were not yet a party to the case at the time of the Remand Order. Therefore, the KDOC Defendants and this Court are not bound by the conclusions of law in the Remand Order, and this Court can consider the KDOC Defendants' arguments regarding this matter, now that the litigation has proceeded to a stage where the Defendants have received notice and an opportunity to respond. Further, the Tenth Circuit expressly limited its holding to the screening stage of litigation in the Remand Order, phrasing it as: "We . . . for screening

purposes under § 1915A, hold . . .” (Doc. 23 at 14.) Since the case is now in a different stage of litigation, that limited holding is no longer binding on the parties or the Court.

1. *The Supreme Court's examples of what could constitute an actual injury in the context of an access-to-courts claim all involve a material impact on the underlying claim.*

The Supreme Court held in *Lewis v. Casey* that although inmates have a right to “a reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement,” the State is not required to enable an inmate “to litigate effectively once in court.” *Lewis v. Casey*, 518 U.S. at 356, 354. So an inmate must demonstrate something more than the State not enabling them to litigate effectively.

The Court explained that an inmate attempting to establish actual injury by pointing simply to a shortcoming in the prison's law library or legal assistance program is “the precise analog of the healthy inmate claiming constitutional violation because of the inadequacy of the prison infirmary.” *Id.* at 351. Here, only adding in whether the inmate's underlying claim was non-frivolous is like only adding in whether the inmate in the analogy is sick. It would not make sense for an inmate only sick with a cold to claim constitutional violation because a prison infirmary lacks drugs to treat cancer, for example. An inmate being sick does not automatically make an inadequacy in the prison infirmary an actual injury to the inmate. Similarly, simply showing a claim is non-frivolous does not show that a given inadequacy of a prison law library affected that claim. Rather, a nexus must exist between the two. The inadequacy of the prison infirmary or law library must impact the inmate's health or legal case, respectively.

The Court provided several notable, concrete examples:

> [The inmate] might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the

> courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint.

*Id.* at 351. Although the Supreme Court provided these examples in dicta, the Tenth Circuit is "bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements." *Laufer v. Looper*, 22 F.4th 871, 881 n.5 (10th Cir. 2022).

The Supreme Court did not suggest that merely filing a non-frivolous claim transforms an alleged shortcoming of a library into an allegation of an actual injury, but rather the Court pointed to more concrete injuries such as the grounds for dismissal or the inability to file a complaint. Note the stark difference in the first sentence in the block quote above if it read instead: "He might show, for example, that a complaint he prepared was [non-frivolous and nothing further must be shown]." Or perhaps this instead: "He might show, for example, that [he subjectively felt] a complaint he prepared was [suboptimal]." The Supreme Court's examples show that the proper standard looks for an objective and material impact.

2. *Tenth Circuit opinions demonstrate this same material impact requirement, basing determinations of actual injury on whether an alleged hindrance had a material impact on the underlying claim.*

In *Simkins v. Bruce*, the Tenth Circuit found that an inmate alleged an actual injury because he alleged the prison interfered with his legal mail in a way "directly and inextricably tied to the adverse disposition of his underlying case and the loss of his right to appeal from that disposition." *Simkins v. Bruce*, 406 F.3d 1239, 1244 (10th Cir. 2005). The court said that:

> Given that plaintiff's failure to receive the summary judgment motion and order in the prior action resulted in (1) admission of the defendants' version of the facts, (2) inability to argue the legal issues, and (3) loss of an opportunity to appeal, this case presents a compelling example of an impediment or hindrance demonstrating actual injury under *Lewis*.

*Id.* at 1243. The court indicated that it would not have found an actual injury, however, if "the underlying case was adversely decided on the basis of a deficiency logically and practically unrelated to the impediment created by the right-of-access defendants." *Id.* at 1244 (approvingly citing *Deleon v. Doe*, 361 F.3d 93, 94 (2d Cir. 2004)). Therefore, the court based its decision on whether the alleged impediment had a material impact on the underlying case.

Other Tenth Circuit cases underscore this rule from *Lewis* and *Simkins*. Ten years after *Simkins*, the Tenth Circuit said, "in *Simkins* . . . . we . . . recognized that the alleged hindrance must bear a causal connection to the alleged injury." *Clark v. Oakley*, 560 F. App'x 804, 807 (10th Cir. 2014). This means that a *hindrance* is not itself an *injury*.

In *Lewis v. Clark*, the inmate alleged that a Wyoming prison lacked Colorado state law materials, which he said made a writ of habeas corpus he filed related to a Colorado charge "a feeble attempt to access the courts." *Lewis v. Clark*, 577 F. App'x 786, 797 (10th Cir. 2014). He also alleged that the $10,000 bond relating his pending charge increased to $20,000 when he missed a court date and the bail bond agent did not receive proof of his incarceration. *Id.* The Colorado court never responded to his writ of habeas corpus. *Id.* The Tenth Circuit found that "he fail[ed] to articulate how alleged deficiencies in [the prison's] law library contributed either to the lack of response from the Colorado court or the increase in his bail bond." *Id.* The inmate "fail[ed] to allege . . . precisely how these consequences can be attributed to deficiencies in [the prison's] legal facilities." *Id.* The court did not mention at all whether the underlying claim was frivolous or whether the alleged deficiencies in the prison law library were truly deficiencies. The court based its decision solely on whether the alleged deficiencies had an objective and material impact on the underlying case.

In *Mayes v. Province*, the inmate alleged that a prison "prevented him from filing a timely federal habeas petition" because he was denied physical access to the law library and because the law resources available to him were inadequate. *Mayes v. Province*, 376 F. App'x, 815, 816 (10th Cir. 2010). The court stated that "although [his] allegations might suggest that additional resources could have been of greater assistance to him, there is no basis in the record before us to believe that he was incapable of filing a timely habeas petition given the resources available." *Id.* at 817. The court did not address whether the underlying habeas claims were frivolous or whether the alleged inadequacy of legal resources was truly an inadequacy. The court based its decision solely on whether the alleged inadequacy had a material impact on the underlying claims.

3. *The District of Kansas has also based the determination of actual injury on whether the alleged hindrance had a material impact on the underlying claim.*

At least one case from the District of Kansas also demonstrates the material impact requirement. In the case, *Davis v. Bruce*, the inmate alleged that a prison infringed his right of access to the courts by providing inadequate library resources and legal assistance, delaying his access to a notary and a copier, and withholding his request for an extension of time to file a writ of certiorari from the mail system for three days. *Davis v. Bruce*, 215 F.R.D. 612, 617, 619 (D. Kan. 2003). He alleged that his request for an extension of time to file a writ of certiorari was denied by the Supreme Court because it was untimely filed. *Id.* at 617. The Court found that:

> the court finds that plaintiff has not stated a claim that, but for the alleged encumbrances of defendants, he would have been able to make a timely application of extension of time. Thus, plaintiff has not stated a claim indicating he suffered injury due to defendants' actions.

*Id.* at 620. The Court did not address at all whether the inmate's underlying claim was frivolous or whether the alleged inadequacies of the library and legal assistance were truly inadequacies.

Rather, the inmate's claim failed due to failure to allege a material impact on his underlying claim.

*4. The Plaintiff in this case does not allege any material impact on his underlying claim.*

The cases cited above show that hindrances must have a concrete and material impact on the underlying claim. Combining all of the above cases, the examples of material impact provided are:

- Adverse disposition of a claim because of a technical requirement the inmate could not learn about through the prison's inadequate resources;
- Inability to file a complaint on an arguably actionable claim because of inadequate legal resources;
- Admission of facts in a summary judgment motion because the prison failed to deliver the summary judgment motion and order to the inmate thereby causing the inmate's failure to respond;
- Loss of an opportunity to respond to the legal arguments in a motion because the prison failed to deliver the motion and order to the inmate thereby causing the inmate's failure to respond; and
- Loss of an opportunity to appeal because of the conduct in the two examples immediately above.

Insufficient grounds include:

- The inmate subjectively feeling that a filing is a "a feeble attempt to access the courts" allegedly because of inadequate legal resources.
- Claiming that additional resources could have been of greater assistance.
- Lack of a favorable response from a court or an increase in a bond without showing "precisely" how those particular consequences can be tied to deficiencies in prison legal facilities.
- Failure to file a court document (such as a habeas petition or a request for an extension of time) on time without showing how deficiencies in prison legal facilities caused the failure.

Here, the Remand Order in this case is technically correct that "for purposes of assessing Leek's access-to-courts claim at issue in this litigation, we need not determine that his Eighth Amendment claim in the underlying *Scoggin* action would or should have succeeded if Leek had been allowed greater access to the law library." (Doc. 23 at 14 (citing *Simkins*, 406 F.3d at 1244).) But that would still be one way to show an actual injury, among many. The statement is technically correct only because other concrete, although lesser, harms to the case could also qualify as an actual injury. Even the case the Tenth Circuit cited for this statement says the grounds for the claim's adverse disposition are relevant to the actual-injury question:

> Even when the underlying case is not frivolous, the nature of its adverse disposition can be relevant to the *Lewis* standing inquiry. Where, for example, the underlying case was adversely decided on the basis of a deficiency logically and practically unrelated to the impediment created by the right-of-access defendants, courts have held that the plaintiff has suffered no actual injury associated with their constitutional misconduct.

*Simkins*, 406 F.3d at 1244; *see also Oakley*, 560 F. App'x at 807 ("in *Simkins* . . . . we . . . recognized that the alleged hindrance must bear a causal connection to the alleged injury"). The Remand Order did not address the nature of the adverse disposition of the *Scoggin* action or any other concrete harm to Leek's case. The Remand Order only found that Leek's underlying claim was non-frivolous, which is insufficient as a matter of law to find that Leek has here alleged an actual injury supporting constitutional standing to bring his claim.

If, hypothetically, Leek had lost the case because he was unaware of a technical requirement, such as a required element of a cause of action, a relevant exception to a defense, or a rule of procedure, and that was caused by inadequacies in the prison's legal facilities, that would show an actual injury. No such showing has been made here. Further, Leek was not so stymied in his legal research that he was unable to file a response to the summary judgment motion on the underlying claim either. He timely filed a response that included numerous

relevant legal case citations and quotations. *See* Pl.'s Resp. to Ct.'s Mem. and Order, *Leek v. Scoggin*, No. 20-3051-SAC, Doc. 48. It does not suffice to claim that he subjectively felt his response was feeble or suboptimal or that additional resources could have been of greater assistance.

Leek has not shown that inadequate legal resources led to him being unaware of any technical requirement that could have affected his claims in *Scoggin*. The *Scoggin* decision did not find against Leek for failure to make legal arguments, but rather failure to demonstrate facts that showed an actionable danger to him. In fact, the court relied on Leek's facts to show he had actually demonstrated the absence of an actionable danger. Leek cited the *Benefield v. McDowall* case (including its citation) which states:

> in order to establish a cognizable Eighth Amendment claim for failure to protect, a plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm, the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component.

*Benefield v. McDowall*, 241 F.3d 1267, 1271 (10th Cir. 2001) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)) (emphasis added).

Therefore, Leek had access to a legal resource showing the objective component of his claim that he failed to meet, "a substantial risk of serious harm," and the subjective component of his claim that he failed to meet, "that the prison official was deliberately indifferent to his safety." Further, the quote Leek included in his brief from the next paragraph of the case says the defendant in *Benefield* "was aware of the *obvious danger* associated with a reputation as a snitch." Pl.'s Resp. to Ct.'s Mem. and Order, *Leek v. Scoggin*, No. 20-3051-SAC, Doc. 48 at 2 (quoting *Benefield*, 241 F.3d at 1271) (emphasis added). But Leek instead demonstrated the lack of an obvious danger through the facts he alleged rather than the presence of an obvious danger. As this Court summarized in its Order dismissing the *Scoggin* complaint:

> Here, Plaintiff only alleged that Defendant Scoggin told other inmates working in the kitchen that Plaintiff reported her to her superiors. Plaintiff alleged that the other inmates working in the kitchen were just as upset with Scoggin and that she had received multiple complaints from those inmates. Furthermore, inmates working in the kitchen were present during the incidents in question when Plaintiff complained about Scoggins. Plaintiff has not alleged that he suffered any repercussions from inmates based on Scoggin's statement or that Scoggin made the statement intending other inmates to injure Plaintiff.

Ct.'s Mem. and Order, *Leek v. Scoggin*, No. 20-3051-SAC, Doc. 51 at 6. It would not be a reasonable inference from these facts to find either element, a substantial risk of serious harm or deliberate indifference to Leek's safety. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

Although if Leek understood the holding of *Benefield* better he may have chosen to drop his claim, he has not shown how additional legal resources would have made any positive material impact on his claim, given the facts that he provided in his verified complaint, which undercut his own claim. *See* Pl.'s 1st Am. Compl., *Leek v. Scoggin*, No. 20-3051-SAC, Doc. 14 at 14 (declaring facts under penalty of perjury); *Vette v. Sanders*, 989 F.3d 1154, 1163 (10th Cir. 2021) ("a verified complaint may be treated as an affidavit"). Leek was not housed at LCF and was not even assigned to Restrictive Housing when he filed his First Amended Complaint in *Scoggin*. Although court records which the Court takes judicial notice of cannot be used to prove the truth of the matters asserted therein, the KDOC Defendants assert that it is implausible that Leek, if he had received additional legal resources while later in Restrictive Housing at LCF, would have amended his complaint to allege facts that contradict those which he earlier declared under penalty of perjury. Therefore, Leek fails to plausibly allege that the prison's provision of allegedly inadequate legal resources had a material impact on his claim, so he fails to allege an

actual injury. Leek's access-to-courts claim should be dismissed for lack of subject-matter jurisdiction due to lack of constitutional standing.

## III. If the Court has jurisdiction, it should dismiss the claim for failure to state a claim because qualified immunity applies when the alleged conduct did not violate clearly established law.

The KDOC Defendants are entitled to qualified immunity because there was no clearly established law within this Circuit, or a robust consensus of cases outside of it, that their alleged actions violated clearly established law, particularized to the facts of this case. Specifically, Leek has not shown any law that put the KDOC Defendants on notice that the alleged exact-cite system infringes on an inmate's right of access to the courts. Because qualified immunity applies, the Court should dismiss the access-to-courts claim for failure to state a claim.

At the time of the alleged actions, while it was clearly established that prison officials must provide inmates "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts," *Lewis v. Casey*, 518 U.S. 343, 351 (1996), no binding precedent in this circuit clearly established that use of an exact-cite system to retrieve case law was unconstitutional. Cases in this circuit suggested that it *may* be unconstitutional, but no cases in this circuit had held that it was. *See Trujillo v. Williams*, 465 F.3d 1210, 1226-27 (10th Cir. 2006) (saying "an 'exact cite' system [] *may* state a viable claim of denial of access to the courts" (emphasis added)); *Clayton v. Tansy*, 26 F.3d 980, 982 (10th Cir.1993) (remanding for the trial court to determine whether an exact-cite paging system resulted in a denial of the right of access to the courts); *Baca v. Mondragon*, 89 F.3d 849 (table opinion), 1996 WL 330290, at *2 (10th Cir. June 6, 1996) ("[T]he trial court recognized the exact cite requirement *may have* denied Mr. Baca meaningful access to the courts; however, the trial court concluded the record demonstrated Mr. Baca received constitutionally adequate assistance from persons

trained in the law. We agree with the district court's reading of the record before it." (emphasis added)); *see also Skelton v. Bruce*, No. 06-3045-JWL, 2007 WL 1469652, at *5 (D. Kan. May 21, 2007) (citing *Trujillo*, 465 F.3d at 1226) ("The use of an 'exact-cite' paging system *may* state a viable claim of denial of access to the courts." (emphasis added)). *But see Clayton v. Tansy*, 21 F.3d 1120 (table opinion), 1994 WL 118145, at *2 (10th Cir. Apr. 6, 1994) (citing *Bounds v. Smith*, 430 U.S. 817 (1977)) (saying in light of an alleged exact-cite system that "prison officials must provide inmates with an adequate law library or general references, such as an encyclopedia, with adequate assistance"), *abrogated by Lewis v. Casey*, 518 U.S. at 351 (overruling *Bounds* and saying inmates do not have an "abstract, freestanding right to a law library or legal assistance").

While a few cases in other circuits have held an exact-cite system to be unconstitutional, these cases are not pervasive enough to constitute a robust consensus of cases outside of this circuit. This is especially true considering that many of these cases were decided prior to the Supreme Court's 1996 decision in *Lewis v. Casey*, which overruled *Bounds* and clarified the boundaries of an inmate's right of access to the courts. *See Rich v. Zitnay*, 644 F.2d 41, 43 (1st Cir. 1981); *Corgain v. Miller*, 708 F.2d 1241, 1250 (7th Cir. 1983); *Toussaint v. McCarthy*, 801 F.2d 1080, 1109-10 (9th Cir. 1986) (citing *Bounds*, 430 U.S. 817) (holding that inmates must be provided either physical access to a law library or legal assistance, and so holding *all* paging systems for access to legal resources unconstitutional), *abrogated by Lewis v. Casey*, 518 U.S. at 351 (overruling *Bounds* and saying inmates do not have an "abstract, freestanding right to a law library or legal assistance").

After the *Lewis v. Casey* decision, the Eleventh Circuit held that alleging an exact-cite system failed to state a claim when an actual injury was not shown. *Juiffre v. Broward Sheriff's*

*Off.*, 717 F. App'x 886, 889 (11th Cir. 2017) ("Juiffre still has not shown that the exact cite research system hindered his 2015 claim in a way that resulted in actual injury."). Although the Ninth Circuit later held in *Griffin v. Grijalva* that *all* paging systems for retrieving legal resources (not just exact-cite systems) are unconstitutional, it did so by relying on its earlier decision *Toussaint* for the proposition that "the state must either provide prisoners with [physical] access to a law library or legal assistance" without any mention that *Lewis v. Casey* abrogated that holding of *Toussaint*. *Griffin v. Grijalva*, 773 F. App'x 1003, 1003 (9th Cir. 2019) (citing *Toussaint*, 801 F.2d at 1109-10). Even prior to the *Lewis v. Casey* decision, when the Third Circuit addressed a prison's paging system for access to legal resources that for purposes of the case was found to be inadequate (through an undisturbed finding by the district court), the appellate court still found the defendants were entitled to qualified immunity:

> We are especially impressed not only with the historically inexact state of the *Bounds* minimum adequacy standard, but with the fact that the district court, the district court's predecessor, the magistrate judge, as well as this very panel have registered conflicting views over the proper application of the *Bounds* standard to the [Maximum Security Unit]. We would thus be exceedingly hard-pressed to hold that these four defendant officials, who are not as learned in the legal discipline as are those responsible for fashioning constitutional rules, could have been expected to recognize the existence and nature of the constitutional right that the district court held to be clearly established. Indeed, if members of the judiciary cannot reach a clear consensus regarding "[t]he contours of the right" articulated in *Bounds*, *see Anderson v. Creighton*, 483 U.S. at 640, 107 S.Ct. at 3039, can we reasonably expect more from those who are required to implement those rights? . . . . We thus hold that the officials in this case were entitled to qualified immunity and, therefore, were shielded from liability for damages.

*Abdul-Akbar v. Watson*, 4 F.3d 195, 205 (3d Cir. 1993).

Accordingly, no clearly established law would have put Defendants on notice that their alleged actions were unlawful under these circumstances. Looking only to the conduct as alleged

in the complaint, Defendants are entitled to qualified immunity as a matter of law. Leek's access-to-courts claim should be dismissed for failure to state a claim.

## IV. Alternatively, the Court should grant summary judgment to the KDOC Defendants because the record supports qualified immunity or because the record conclusively shows Leek's allegations to be unfounded.

### A. The evidentiary record in this case bolsters the qualified immunity defense, so the Court should find qualified immunity on summary judgment even if it is not found on dismissal.

Even if the Court finds insufficient grounds to support qualified immunity on a motion to dismiss for failure to state a claim, the Court can look to additional evidence outside the complaint to support qualified immunity on summary judgment. The grounds for qualified immunity become clearer in light of the evidentiary record in this case.

In addition to the absence of law clearly establishing that an exact-cite system was unconstitutional (as discussed above), prison officials had legitimate reasons for restricting Leek's access to legal resources. A prisoner's access to legal resources can be restricted if the restrictions are reasonably related to legitimate penological interests and are not an exaggerated response to those concerns. *Wardell v. Duncan*, 470 F.3d 954, 960 (10th Cir. 2006) (citing *Beard v. Banks*, 548 U.S. 521, 528 (2006)) (addressing restrictions of an inmate's First Amendment rights in general in the context of the right to receive mail); *Penrod v. Zavaras*, 94 F.3d 1399, 1403-04 (10th Cir. 1996) (addressing restrictions specifically on an inmate's access to legal resources). In evaluating a restriction, "courts owe substantial deference to the professional judgment of prison administrators." *Beard*, 548 U.S. at 528. *Beard* and *Wardell* discuss four relevant factors established by the Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987):

> First, is there a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it? Second, are there alternative means of exercising the right that remain open to prison inmates? Third, what impact will accommodation of the asserted constitutional right have

> on guards and other inmates, and on the allocation of prison resources generally? And, fourth, are ready alternatives for furthering the governmental interest available?

*Wardell*, 470 F.3d at 960 (quoting *Beard*, 548 U.S. at 529).

Regarding the first factor, legitimate government interests include "maintaining prison order and safety." *Hammons v. Saffle*, 348 F.3d 1250, 1255 (10th Cir. 2003). They also include "budgetary considerations." *Twyman v. Crisp*, 584 F.2d 352, 359 (10th Cir. 1978) (cited approvingly by *Penrod*, 94 F.3d at 1404 (10th Cir. 1996)). Regarding the second factor, the Tenth Circuit has "emphasized that the alternatives need not be ideal, they need only be available." *Wardell*, 470 F.3d at 961. "Thus, even if not the 'best method' from the inmate's point of view, if another means of exercising the right exists, the second *Turner* factor does not undercut the challenged restriction." *Id.* at 961-62. Regarding the fourth factor, "this is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable method of accommodating the claimant's constitutional complaint." *Id.* at 962 (quoting *Turner*, 482 U.S. at 90-91). Rather, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner*, 482 U.S. at 91.

Here, prison officials established restrictions on access to legal resources for LTRH inmates, who are considered especially dangerous inmates. The officials decided that LTRH inmates could not have physical access to the law library to prevent violent incidents and dangerous communications and because of the staffing requirements to escort inmates there. RH residents cannot check out hardcover law books because of safety and contraband concerns, and they cannot check out paperback law books because those are considered reference materials,

which have to remain on the shelves. The checkout limit helps manage the costs of providing copies. The paperwork limit helps prevent contraband, fire hazards, arson, clutter, and visibility obstruction. Exceptions to the checkout limit can be granted by unit teams and exceptions to the paperwork limit can be granted by facility attorneys based on the demands and deadlines of an inmate's active court cases. Partner research is generally not allowed for RH residents to prevent dangerous communications that can lead to contraband or other security threats.

All of these restrictions serve a legitimate penological interest, such as prison order, prison safety, and budgetary considerations. A reasonable officer could in good faith rely on these reasons to support the restrictions, especially in light of the lack of an unequivocal judicial holding in the Tenth Circuit holding any of these restrictions to be a violation. Accordingly, the Court should grant summary judgment to the KDOC Defendants on qualified immunity grounds.

**B. The record shows conclusively that Leek had access to more than just an exact-cite system for retrieving legal resources.**

Leek asserts that he could only infrequently receive a limited number of cases and that he could only receive them if he requested them by their exact citation. But if Leek had used a Form 9 to ask the library for a list of the law books available, a list would have been provided to him. He could have requested and received copies of the tables of contents of law books or copies of particular sections of law books, which could have provided him with relevant cases. Even if those law book sections did not quite provide him with the exact citation of a case, he could have requested and received copies of cases by providing enough information to identify the case such as the case title. He did in fact receive several copies of cases from the library.

The LCF library sends out hundreds of copies of case law and policies every month. Even without LexisNexis, the library would provide access to copies of the following: a book list, tables of contents, law books, cases, policies, statutes, tax forms, and legal forms. LCF's Public

Information Officer was available to answer Kansas Open Records Act requests. The library provided "legal packs" of supplies, e-filed court filings, promptly responded to Form 9 requests for legal resources, and delivered and picked up legal resources from the RH units every day.

If Leek still had trouble accessing legal resources, he could send requests to Legal Services for Prisoners, and he could also contact individuals outside the prison for assistance in locating resources. If he had trouble with the checkout limit, he could have requested and perhaps received an exception to the library's checkout limit from his unit team based on the demands and deadlines of his active cases. Even if he did not receive such as an exception, he could have purchased additional copies using copy tickets or account withdrawal requests. Indigent forms could have potentially helped avoid using copy tickets, allowing a small-value AWR that would not could toward his canteen spending limit. He also could have received an exception to the LTRH unit's paperwork limits from a facility attorney had he requested such an exception based on the demands and deadlines of his active cases.

Although Leek complained about the alleged exact-cite system in a grievance (Pl.'s 2d Am. Compl. Ex.'s at 37), the library did not have a chance to respond because the library only receives Form 9's directed to the library. His grievance went to the unit team. But the unit team did not have a chance to grant an exception to the checkout limit because he did not request an exception in his grievance.

Although Leek asserts that he only had access to an exact-cite system, Leek's version of the facts is "blatantly contradicted by the record, so that no reasonable jury could believe it," so this Court "should not adopt that version of the facts for purposes of ruling on [the KDOC Defendants'] motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Leek had access to more than just an exact-cite system. He had ways available to identify relevant

cases. Therefore, the reasoning behind the Tenth Circuit reversing and remanding on the access-to-courts claim (*see* Doc. 23 at 10-12) does not apply, and the Court should grant summary judgment in favor of the KDOC Defendants on Leek's access-to-courts claim.

**V. Even if Leek states a claim that survives summary judgment, he would only be entitled to nominal damages, so the Court should grant partial summary judgment to limit other remedies.**

Rule 56 of the Federal Rules of Civil Procedure allows for "partial summary judgment," not necessarily on whole claims, but on a "part of each claim or defense." Here, even if Leek states an access-to-courts claim that survives summary judgment, the Court should grant partial summary judgment to the KDOC Defendants on Leek's requested remedies other than nominal damages.

**A. Leek is not entitled to compensatory damages under the PLRA when he cannot show physical injury or that his underlying claim would have had a more favorable outcome.**

As discussed above, to meet the *actual injury* requirement for constitutional standing, Leek does not necessarily have to show that his underlying claim in *Scoggin* would have succeeded. But to receive compensatory damages and not just nominal damages, he would have to show a *compensable injury*, which means he would either have to show that he was physically injured or that his underlying claim would have succeeded, settled, or otherwise resulted in a payout that Leek could be compensated for not receiving.

Under the Prison Litigation Reform Act (PLRA), Leek cannot receive damages "for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." Prison Litigation Reform Act, 42 U.S.C. § 1997e(e). Leek has not alleged a physical injury or the commission of a sexual act, so he cannot receive damages for mental or emotional injury in this case.

What is more, Leek has not alleged that his underlying claim in *Scoggin* would have had a more favorable outcome without the alleged interference of the KDOC Defendants, much less any grounds upon which that claim could have succeeded. *See Simkins v. Bruce*, 406 F.3d 1239, 1244 n.5 (10th Cir. 2005) ("In order to prevail on a § 1983 right of access claim and substantiate more than nominal damages, a plaintiff may have to engage the merits of the underlying case."). The underlying claim was decided as a matter of law, so without providing any legal grounds upon which it could have succeeded, no reasonable jury could find that it would have had a more favorable outcome but for the alleged interference of the KDOC Defendants.

Leek is not entitled to compensatory damages because he has failed to allege a compensable injury.

**B. Leek is not entitled to punitive damages when he cannot show any conduct was motivated by evil intent or was undertaken with reckless or callous indifference to his constitutional rights.**

Leek is not entitled to punitive damages against the KDOC Defendants for want of the requisite subjective intent. A § 1983 plaintiff claiming punitive damages must prove defendants' conduct either "is shown to be motivated by evil motive or intent" or "involves reckless or callous indifference to" his federal constitutional rights. *Searles v. Van Bebber,* 251 F.3d 869, 879 (10th Cir. 2001) (quoting *Smith v. Wade,* 461 U.S. 30, 56 (1983)). Barring pleading and proof that a defendant "either acted with malice or knew [his] actions were unconstitutional," a § 1983 plaintiff cannot pursue a claim for punitive damages. *See Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992). Leek has not alleged or provided any evidence that any of the KDOC Defendants acted with the required maliciousness, evil motive, or with reckless indifference to Leek's civil rights, or that they subjectively knew their actions were unconstitutional under clearly established law. Therefore, as a matter of law, Leek cannot receive punitive damages.

**C. Leek's requests for injunctions are moot because KDOC has taken corrective measures, He has moved to a different facility, and some relevant claims have already been dismissed.**

"Article III delimits the jurisdiction of federal courts, allowing [them] to consider only actual cases or controversies." *Kan. Jud. Rev. v. Stout,* 562 F.3d 1240, 1245 (10th Cir. 2009). "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Off. Eng. v. Arizona,* 520 U.S. 43, 67 (1997).

> In deciding whether a case is moot, the crucial question is whether granting a present determination of the issues offered will have some effect in the real world. When it becomes impossible for a court to grant effective relief, a live controversy ceases to exist, and the case becomes moot.

*Kan. Jud. Rev.,* 562 F.3d at 1246 (citation omitted). "The touchstone of the mootness inquiry is whether the controversy continues to touch the legal relations of parties having adverse legal interests in the outcome of the case." *Wirsching v. Colorado*, 360 F.3d 1191, 1196 (10th Cir. 2004) (quoting *Cox v. Phelps Dodge Corp.*, 43 F.3d 1345, 1348 (10th Cir. 1994), *superseded on other grounds as recognized in Walker v. United Parcel Serv., Inc.*, 240 F.3d 1268, 1278 (10th Cir. 2001)). "[T]his legal interest must be more than simply the satisfaction of a declaration that a person was wronged." *Id.* Further, "a plaintiff cannot maintain a declaratory or injunctive action unless he or she can demonstrate a good chance of being likewise injured by the defendant in the future." *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1224 (10th Cir. 2009).

Here, Leek seeks various injunctions against the KDOC Defendants separately. (Doc. 9 at 21.) Leek does not seek any injunctive relief against Defendant Misti Kroeker. Against Deputy Warden James Skidmore, Leek seeks an injunction ordering him to "[r]efrain from imposing a policy that restricts prisoners in the LTRH unit from assisting each other in legal matters." But as discussed above (in section I of this memorandum), the relevant claim regarding inmates not

being allowed to assist each other with legal research has already been dismissed, so this request for injunctive relief against Skidmore is moot.

Against the other KDOC Defendants, Meyer and Stiffin, Leek seeks injunctions related to providing additional legal resources to RH residents at LCF. But KDOC has already implemented a program that provides additional legal resources to these inmates through a new tablet program. Therefore, these requests for injunctive relief are now moot.

What is more, Leek is no longer incarcerated at LCF, but has been at the El Dorado Correctional Facility since April 12, 2022 (other than a one-week stint back at LCF in June 2022). Therefore, he cannot "demonstrate a good chance of being likewise injured by the defendant[s] in the future." *Corder*, 566 F.3d at 1224; *see also Jordan v. Sosa,* 654 F.3d 1012, 1028 n.17 (10th Cir. 2011) (stating "where a prisoner is no longer housed at the penal institution having the conditions of confinement that form the basis of his suit, declaratory relief—as well as injunctive relief—is ordinarily not available"). Simply put, any deficiencies in the legal resources provided to inmates in the LTRH unit at LCF have been corrected and Leek is no longer at LCF, so granting Leek's requested injunctions against Meyer and Stiffin would not have any effect in the real world. *See Kan. Jud. Review*, 562 F.3d at 1246. The requested injunctions are moot.

Therefore, even if Leek states a claim that survives summary judgment, the Court should grant partial summary judgment to the KDOC Defendants limiting his requested remedies because he is not entitled to compensatory or punitive damages and his requested injunctions are moot.

### VI. The Court should dismiss the state law breach-of-contract claim for clear lack of contractual standing or, alternatively, decline to exercise supplemental jurisdiction given the absence of a sufficient federal claim.

Exercising supplemental jurisdiction over state law claims when no federal claims remain can be proper when the state law claims are easy to resolve. *See Nielander v. Bd. of Cnty. Comm'rs*, 582 F.3d 1155, 1172 (10th Cir. 2009). Here, the KDOC Defendants incorporate by reference the arguments made by Defendant ICSolutions in its Motion to Dismiss or in the Alternative for Summary Judgment (Doc. 32) – specifically, the arguments therein that Leek is not an intended third-party beneficiary and therefore lacks standing to bring the breach-of-contract claim. The KDOC Defendants add, to avoid confusion with the other "standing" arguments made in earlier sections of this brief, that the type of standing missing for this breach-of-contract claim is not Article III standing, which is jurisdictional, but rather "statutory or contractual" standing, which is on the merits. *See Flores v. Nickelson*, No. 16-3022-JAR, 2019 WL 1228234, at *2 & n.13 (D. Kan. Mar. 15, 2019) (citing *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 n.6 (10th Cir. 2012)). The Court correctly interpreted ICSolutions' motion as a motion to dismiss under Rule 12(b)(6) for failure to state a claim and granted the motion on September 6, 2022. (Doc. 45.) The reasoning supporting that dismissal applies equally to the claim against Defendant Kroeker as to the claim against Defendant ICSolutions. This makes the state law breach-of-contract claim against Kroeker easy to resolve, so the KDOC Defendants request that the Court dismiss this claim on the merits for lack of contractual standing.

Alternatively, the Court could decline to exercise supplemental jurisdiction over the state breach-of-contract claim if the Court disposes of the federal claims as argued for above. When no federal claims remain, "the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir.2011).

**CONCLUSION**

All claims against Deputy Warden Skidmore have already been dismissed from this case, so he should be dismissed from this case. Leek's access-to-courts claim against Warden Meyer in her official capacity for monetary damages and declaratory relief should be dismissed for lack of subject-matter jurisdiction due to Eleventh Amendment immunity. Leek's access-to-courts claims against the KDOC Defendants should be dismissed for lack of subject-matter jurisdiction because Leek lacks constitutional standing under Article III. This is because he has failed to plausibly allege an actual injury impairing his right of access to the courts when his underlying claim in *Scoggin* was not materially impacted.

If the Court has jurisdiction, it should dismiss the claim for failure to state a claim because qualified immunity applies when the conduct as alleged did not violate clearly established law. Alternatively, the court should grant summary judgment to the KDOC Defendants because the qualified immunity defense is bolstered by the evidentiary record in this case or because the record conclusively shows that the exact-cite system alleged by Leek was not actually the system used at LCF. Even if Leek states a claim that survives summary judgment, the Court should grant partial summary judgment to the KDOC Defendants on Leek's requested remedies other than nominal damages. Leek is not entitled to compensatory damages because he fails to allege a compensable injury, he is not entitled to punitive damages when he cannot demonstrate the requisite subjective intent, and his requests for injunctive relief are moot.

Finally, the Court should dismiss the state law breach-of-contract claim for clear lack of contractual standing because Leek is not an intended third-party beneficiary under the contract or, alternatively, decline to exercise supplemental jurisdiction over the state law claim given the absence of a sufficient federal claim.

Respectfully submitted,

OFFICE OF ATTORNEY GENERAL
DEREK SCHMIDT

*/s/ Matthew L. Shoger*
Matthew L. Shoger, KS No. 28151
Assistant Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
matt.shoger@ag.ks.gov
785-296-2215
Fax: (785) 291-3767
*Attorney for KDOC Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of October, 2022, the foregoing document was filed with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to the following:

Alexander Chosid
TKC Holdings, Inc.
1260 Andes Boulevard
St. Louis, MO 63132
314-214-2806
alex.chosid@tkcholdings.com
*Attorney for ICSolutions*

I also certify that a copy of the above was served by means of first-class mail, postage prepaid, addressed to:

Kenneth D. Leek, #63523
EL DORADO Correctional Facility-Central
PO Box 311
El Dorado, KS 67042
*Plaintiff, pro se*

*/s/ Matthew L. Shoger*
Matthew L. Shoger
Assistant Attorney General