IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| KENNETH D. LEEK, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> KATHRYN A. ANDROSKI, *et al.*, ) <br> ) <br> Defendants. ) <br> ) | Case. No. 21-3100-SAC-ADM |

## DECLARATION OF SHANNON MEYER

I, Shannon Meyer, being of lawful age, make the following declaration pursuant to 28 U.S.C. § 1746 relating to the captioned matter based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment.

1. I was the warden of Lansing Correctional Facility (LCF) from August 2019 to November 2021.

2. My duties as warden included ensuring the safety and security of the facility, the inmates, and the staff, ensuring that policies and procedures were followed, overseeing employment matters such as hiring and discipline, and handling questions, concerns, and issues brought up by inmates and staff.

3. LCF could house approximately 2,300 to 2,400 inmates while I was warden, and had about 400 staff.

4. Inmates brought questions, concerns, and issues to me by means of grievance appeals, form 9's, and also verbal communications when I would walk through the facility multiple times a week.

## Policies and Procedures

5. Internal Management Policies and Procedures (IMPP's) apply throughout the Kansas Department of Corrections.

6. IMPP's with a number that ends in "A" are specifically for all adult facilities throughout the Kansas Department of Corrections.

7. Each facility issues its own General Orders (GO's). These GO's often pair with IMPP's to give more specifics.

8. As warden, I approved GO's and reviewed them yearly on a schedule along with a leadership team. That team varied based on the particular GO being looked at, but often included myself as the warden along with the deputy wardens, the chief of security, the human resources manager, the business manager, the public information officer, and representatives from security, case management, and other areas as needed.

9. Sometimes, we would also update a GO outside of the regular review schedule based on feedback from staff and inmates about day-to-day operations.

## Restrictive Housing

10. While I was Warden, LCF opened a new unit called the Long Term Restrictive Housing (LTRH) Unit. This unit housed inmates from prisons all over the state who were the most violent, the most influential with regard to security threats such as gang

activities, smuggling contraband, or compromising staff, or had the worst behavior issues such as repeated offenses related to contraband, undue familiarity with staff, or lewd acts. The LTRH unit was intended to house these inmates for at least a year before hopefully starting the process of reintroducing the inmates into General Population.

11. Other Restrictive Housing (RH) at LCF was relatively short-term in comparison. Inmates could be placed in RH for reasons including disciplinary segregation (limited to 15 days), protective custody, active investigation, other security risk, and consistent bad behavior.

12. Inmates in LTRH as well as most inmates in RH were in RH because they were a very dangerous group of individuals with a high potential for bad behaviors to continue. Being in RH, they sometimes felt they did not have a lot to lose, which could exacerbate behaviors further.

13. Inmates in RH were kept separate from inmates in general population whenever possible to prevent violent incidents and to prevent dangerous communications, which could be used to coordinate various security threats. Any time inmates left their RH pod, they could potentially leave a note or run into other people with whom they could communicate or cause an incident. Taking them out of the pod would have defeated the purpose of the RH units.

14. Medical services and meals were provided in each RH pod to keep inmates in RH from having to leave their pod for those services. They would only leave the pod for medical services in the case of a medical emergency.

15. Although communications inside the prison were limited for RH residents, communications outside the prison were less limited. RH residents could talk with family on the phone almost daily and communicate by writing via mail or electronic messages via the software service J-Pay, which was available to them on tablets that they could check out.

16. Whether in general population or RH, an inmate's list of allowed phone contacts was screened. All phone calls (other than legal calls) for any inmate were recorded. RH residents' phone calls (other than legal calls) were more closely monitored than those of residents in general population.

## Library Restrictions for Inmates in Restrictive Housing

17. Physical library access was not allowed for inmates in RH to prevent violent incidents, to prevent communication with security threat groups, and because it would be impossible to find enough staff to escort numerous RH inmates back and forth to the library.

18. On the way to the library, inmates would likely pass by twenty to 100 other people, as General Population has a lot of foot traffic. This contact could lead to the kind of incidents and communications that the RH units were meant to prevent.

19. Hardcover books were not allowed in RH units because inmates can easily hide messages or contraband in the bindings of the books, use the books as bludgeoning weapons, or even make makeshift body armor out of them.

20. Paperback books were allowed in RH, although limited in number per inmate. But the law books in the library were hardcover.

21. Paperwork limits applied to inmates in RH. One reason was to help prevent contraband. A large quantity of paper makes contraband easier to hide and to get past inspections.

22. Around early 2020, "saturated paper" started becoming a problem for Kansas prisons. Saturated paper refers to paper saturated with illicit drugs, which is a contraband issue that is very difficult to detect. Paperwork limits helped reduce the risk of saturated paper.

23. Large amounts of paper would also pose a fire hazard. Sometimes inmates would try to set fires in their cells. Paperwork limits helped reduce the risk of fire hazards and arson.

24. Paperwork limits also help reduce the amount of trash and clutter in cells.

25. Inmates sometimes used paper to obscure cell windows and cell lights, reducing staff's visibility into the cell. Paperwork limits helped avoid this security issue.

26. Exceptions to the paperwork limits could be granted by facility attorneys based on the demands and deadlines of an inmate's active court cases.

27. Partner research was generally not allowed for RH residents to prevent dangerous communications.

28. LexisNexis was not available on tablets to inmates in RH while I was warden.

29. RH residents could request legal resources using a form 9.

30. RH residents could request photocopies of the table of contents of a law book or of a particular section of a law book.

31. RH residents could request copies of IMPP's and GO's. For example, RH residents often requested IMPP's and GO's to learn more about the RH units' limits on property and on available canteen items for RH residents. A table of contents showing IMPP's and GO's was often provided to help residents identify the IMPP's and GO's they wanted.

32. Cases could be provided by library staff if enough identifying information was provided to make clear which case the inmate wanted, such as a citation or a case title.

33. Library staff was not licensed to practice law and therefore requests for assistance in locating cases or other legal resources were referred to Legal Services for Prisoners.

34. RH residents also sometimes received assistance in locating legal resources through phone calls with outside individuals.

35. The number of items that could be checked out from the library free of charge were limited in number. If an inmate could not afford additional copies, indigent forms were available for them to fill out and request additional copies free of charge under an indigent status.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 30, 2022.

_____
Shannon Meyer
Former Warden, Lansing Correctional Facility
Kansas Department of Corrections